**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**Holding a Criminal Term
Grand Jury Sworn in on April 29, 2005**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case Number:** |
| | : | |
| | : | **Grand Jury Original** |
| | : | |
| | : | **Violations:** |
| | : | |
| | : | **18 U.S.C. §§ 1341, 1343, 1346** |
| | : | **(Honest Services Mail and Wire Fraud)** |
| v. | : | |
| | : | **18 U.S.C. § 1951** |
| | : | **(Extortion)** |
| | : | |
| | : | **18 U.S.C. § 201(b)(2)(A)** |
| | : | **(Bribery)** |
| | : | |
| **NARASE BOB OUDIT** | : | **18 U.S.C. § 981(a)(1)(C)** |
| **Defendant** | : | **(Forfeiture)** |

**INDICTMENT**

The Grand Jury charges that:

**COUNTS 1-4
Honest Services Wire and Mail Fraud**

At all times relevant to this Indictment:

1.      Defendant NARASE BOB OUDIT ("OUDIT") was employed as a General

Engineer in the Capital Construction Services Division of the District of Columbia's Office of

Property Management ("OPM").  OUDIT was a project manager who oversaw construction

projects for the Department of Parks and Recreation.  OUDIT's office was located at 2000

Fourteenth Street, N.W., in the District of Columbia.

2.      OUDIT's job duties included: approving construction plans, recommending specifications for contracts, inspecting work on projects, approving payments to contractors, overseeing contractors' performance, and taking appropriate remedial action against poorly performing contractors, such as issuing a notice of deficient performance or recommending the termination of a contract. OUDIT also had the authority to recommend the adoption of change orders, which were modifications to contracts. OUDIT's job duties gave him the ability to inflict financial harm upon contractors or to reward them.

3.      BT Contractors, Inc. ("BT Contractors"), incorporated in Maryland on November 7, 2001, was a general contractor providing construction services. The original directors of BT were OUDIT and his wife. On a form submitted to the District of Columbia government on or about April 12, 2002, BT listed OUDIT's wife as its President. At around this time, BT designated OUDIT's accountant, RD, as its new President. Even after this formal change, OUDIT directed BT's activities. He continued to negotiate contractual arrangements on BT's behalf and, in conversation, referred to BT as "we" or "I". OUDIT also continued to have a financial interest in BT, using money from BT's accounts for his own use and to pay personal bills, and keeping blank checks from BT's account in his home.

4.      Contractor A was a building and general contracting company located in Beltsville, Maryland. In February 2001, the District of Columbia awarded a $2.5 million contract to Contractor A to build a recreation center at North Michigan Park. In March 2002, the District of Columbia granted another contract to Contractor A, this time for $7.9 million to build a recreation center at Turkey Thicket.

5.      Contractor B was a general contracting company located in Gaithersburg, Maryland.  In October 2001, the District of Columbia granted Contractor B a $4.1 million contract to build the Sherwood Recreation Center.

6.      Contractor C was a hardwood flooring company that specialized in gymnasium flooring and was located in Malvern, Pennsylvania.  In January 2002, Contractor C received a $70,440 contract to install gymnasium flooring in the North Michigan Park project.  In May 2002, Contractor C received a $93,000 contract to build gymnasium flooring at the Kenilworth Recreation Center.

7.      OUDIT was the project manager for the North Michigan Park, Turkey Thicket, Sherwood Recreation Center, and Kenilworth Recreation Center projects.

## The Scheme to Defraud

8.      From in or about early 2002, through in or about February 2003, in the District of Columbia and elsewhere, defendant NARASE BOB OUDIT knowingly and willfully devised and intended to devise a scheme and artifice to defraud and deprive the District of Columbia of its right to the honest and faithful services of OUDIT, as an employee of the Office of Property Management, performed free from deceit, favoritism, bias, self-enrichment, self-dealing and concealment.

## The Purpose of the Scheme

9.      It was the purpose of the scheme for OUDIT to use his position at OPM to obtain from Contractors A, B, and C, through bribery, economic extortion, self-dealing, and deceit, money for himself and for BT Contractors, Inc., and to conceal his activities from his superiors and others.

**The Manner and Means of the Scheme**

10.     It was a part of the scheme and artifice to defraud that, using his position at OPM, OUDIT demanded money from Contractor A in exchange for permitting Contractor A to receive a necessary time extension for the North Michigan Park project:

a.      On or about August 26, 2002, OUDIT demanded a $294,000 payment from Contractor A.  OUDIT instructed Contractor A to "put [the money] in a brown bag and send it down the road."

b.      On or about August 27, 2002, Contractor A asked OUDIT what would happen if Contractor A did not pay OUDIT's bribe.  OUDIT replied,  "Here's what's going to happen.  It's going into default.  If it goes into default, you lose both [projects].  You don't want to do that.  Then you're going to, bonding company takes over and they finish the job."  OUDIT  continued, "And then you're going to be sued.  Now you don't want that."  OUDIT further explained, "If you do like I said yesterday and it comes through on Friday, what they will do is try to provide you with additional time to finish it without going the other way."

c.      On or about August 30, 2002, OUDIT received $7,500 in cash, in pre-recorded Federal Bureau of Investigation ("FBI") funds, from Contractor A.

d.      On or about September 6, 2002, OUDIT received $6,000 in cash, in pre-recorded FBI funds, from Contractor A.

e.      On or about September 13, 2002, after failing to receive the balance of the $294,000 that he had demanded, OUDIT telephoned Contractor A's bonding company and informed the company that OPM was prepared to terminate

Contractor A's North Michigan Park contract, and that bonding company would

be required to complete the project.

f.       On or about September 23, 2002, OUDIT once again told Contractor A

that unless Contractor A gave OUDIT additional money, Contractor A would not

receive a time extension.

11.      It was further part of the scheme and artifice to defraud that, using his position at

OPM, OUDIT  demanded that Contractor B submit an inflated change order that would cause

BT Contractors to receive $312,519 from a Sherwood Recreation Center subcontract.  OUDIT

instructed Contractor B that, using his authority at OPM, OUDIT would procure the approval

of the sham change order.  OUDIT also told Contractor B that OUDIT's support of a different

change order, in which Contractor B requested a time extension, was conditioned on Contractor

B's submission of the $312,519 change order:

a.       In or about April 2002, acting as BT Contractor's lead negotiator, OUDIT

obtained an approximately $1 million subcontract from Contractor B to perform

construction work at Sherwood Recreation Center.

b.       In or about May 2002, BT Contractors submitted to Contractor B a request for a

change order (later known as "Change Order #4"), in which BT Contractors sought an

additional $312,519 supposedly for unexpected excavation, removal, and hauling work

on the project.  This cost estimate was wildly inflated.  For Change Order #4 to take

effect, Contractor B, the general contractor would have to forward it to OPM, which

would have to approve it.

c.       On or about June 26, 2002, Contractor B submitted to OPM Change Order #3,

requesting an extension of 90 days on the project, based on delays by OPM in returning drawings and other documents.

d.    On or about August 9, 2002, OUDIT instructed Contractor B that unless Contractor B submitted the fraudulent Change Order #4, OUDIT would ensure that Change Order #3 would not be approved. OUDIT assured Contractor B that OUDIT would use his position to procure OPM's approval of Change Order #4. When Contractor B complained that Change Order #4 was a ruse that would arouse suspicion, OUDIT offered to reduce the change order to approximately $271,000.

e.    On or about August 29, 2002, Contractor B informed OUDIT that it was terminating its subcontract with BT Contractors. In the conversation, OUDIT stated, "I gave you all the time extension. Now don't play hardball with me, alright? Because I'm going to take it away. Then you're all going to eat this." OUDIT later said, "Do you think working for the government pays enough money? ... I gotta do something to make a little on the side, too. I mean, I have my own little construction company." OUDIT also told Contractor B, "I'll give you something out of the deal. I'm not stingy," and assured Contractor B that "nobody has to know."

12.    It was further part of the scheme and artifice to defraud that, using his position at OPM, OUDIT demanded that Contractor C submit inflated bids to prepare flooring at Kenilworth Recreation Center, North Michigan Park, and Sherwood Recreation Center, hire BT Contractors as a subcontractor, and pay BT Contractors for work that it never performed. OUDIT represented that unless Contractor C gave money to BT Contractors, OUDIT would cause OPM not to pay Contractor C.

a.       In or about May 2002, Contractor C submitted to OUDIT a $64,800 proposal to prepare flooring at the Kenilworth Recreation Center.  Shortly thereafter, OUDIT directed  Contractor C to increase the bid to $93,000 and to use the additional roughly $25,000 to subcontract to BT Contractors.

b.       In or about July 2002, Contractor C discovered that BT Contractors had not performed any work on project.  Nevertheless, OUDIT demanded that Contractor C pay BT Contractors $25,000.  OUDIT warned that if Contractor C did not tender this money, OUDIT would ensure that OPM did not pay Contractor C for the work it had performed pursuant to the contract.

c.       Pursuant to this arrangement, Contractor C sent the following checks, each by Federal Express, to BT Contractors, which negotiated the checks:

| Date | Check Number | Amount |
|---|---|---|
| 7/9/02 | 8027 | $12,500 |
| 8/29/02 | 8205 | $7,000 |
| 10/28/02 | 8406 | $5,500 |

d.       In or about early 2002, Contractor C spoke to OUDIT about submitting to OPM a proposal to install flooring at North Michigan Park.  OUDIT instructed Contractor C to add to the proposal $15,000, which Contractor C would use to subcontract to BT Contractors.  Contractor C complied, and submitted a bid for $70,440, which included $15,000 for BT Contractors.

e.       BT Contractors did not perform any work on the North Michigan Park project.

f.       Pursuant to this agreement, Contractor C sent the following checks, each by

Federal Express, to BT Contractors, which negotiated the checks:

| Date | Check Number | Amount |
|---|---|---|
| 11/18/02 | 8468 | $5,000 |
| 12/27/02 | 8552 | $4,000 |
| 1/3/03 | 8565 | $3,000 |
| 1/8/03 | 8567 | $1,500 |

g.    On or about February 25, 2003, Contractor C sent a $1,500 check to BT Contractors, which never negotiated the check. This check was intended to complete payment for the $15,000 that OUDIT had instructed Contractor C to pay to BT Contractors.

h.    In or about August 2002, Contractor C submitted to OUDIT a proposal to construct a gymnasium floor, for $85,630, in the Sherwood Recreation Center. OUDIT told Contractor C, once again, to inflate his bid and use the money to pay BT Contractors. This time, Contractor C declined to inflate the bid.

**Use of Interstate Wires to Execute the Scheme**

13.    On or about the date of each count listed below, in the District of Columbia and elsewhere, defendant NARASE BOB OUDIT, for the purpose of executing the above-described scheme and artifice to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the following writings, signals, and sounds:

**Count**    **Date**    **Wire Transmission**

1    8/26/02    Telephone call from Contractor A, in Maryland, to OUDIT, in the District of Columbia, following up on OUDIT's demand, made earlier that day, for $294,000

8

| 2 | 8/9/02 | Telephone call from Contractor B, in the District of Columbia, to OUDIT, in Maryland, in which, among other things, OUDIT stated that unless Contractor B submitted Change Order #4, OUDIT would ensure that Change Order #3 would not be approved |

**(Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343, 1346, 2)**

**Use of a Commercial Interstate Mail Carrier to Execute the Scheme**

14.     On or about the date of each count listed below, in the District of Columbia and

elsewhere, defendant NARASE BOB OUDIT, for the purpose of executing the above-described

scheme and artifice to defraud, caused to be deposited the following matters and things to be sent

and delivered by a commercial interstate carrier, namely, Federal Express, and caused such

matters and things to be delivered by the interstate carrier according to the direction thereon:

| Count | Date | Mailing |
|-------|------|---------|
| 3 | 8/29/02 | $7,000 check, payable to BT Contractors, sent, by Federal Express, from Contractor B, in Pennsylvania, to BT Contractors, in Maryland |
| 4 | 12/27/02 | $4,000 check, payable to BT Contractors, sent, by Federal Express, from Contractor B, in Pennsylvania, to BT Contractors, in Maryland |

**(Honest Services Mail Fraud, in violation of 18 U.S.C. §§ 1341, 1346, 2)**

**COUNT 5**
**Extortion**

15.     Paragraphs 1-7 and 10 of this Indictment are incorporated by reference as if set

out in full.

16.     From in or about August 2002 through in or about September 2002, in the District

of Columbia and elsewhere, defendant NARASE BOB OUDIT, attempted to affect commerce

and the movement of articles and commodities in commerce by extortion, that is, as set forth more fully in Paragraph 10, OUDIT unlawfully attempted to obtain approximately $294,000 from Contractor A, with Contractor A's consent, induced by the wrongful use of fear of economic harm.

**(Extortion, in violation of 18 U.S.C. §§ 1951, 2)**

## COUNT 6
## Bribery

17.     Paragraphs 1-7 and 10 of this Indictment are incorporated by reference as if set out in full.

18.     From in or about August 2002 through in or about September 2002, in the District of Columbia and elsewhere, defendant NARASE BOB OUDIT, a public official, directly and indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept things of value personally and for others, in return for being influenced in the performance of an official act, that is, as set forth more fully in Paragraph 10, OUDIT demanded approximately $294,000 from Contractor A in return for being influenced in whether to support Contractor A's request for a time extension.

**(Bribery, in violation of 18 U.S.C. §§ 201(b)(2)(A), 2)**

## COUNT 7
## Bribery

19.     Paragraphs 1-7 and 11 of this Indictment are incorporated by reference as if set out in full.

20.     From in or about May 2002 through in or about August 2002, in the District of Columbia and elsewhere, defendant NARASE BOB OUDIT, a public official, directly and

indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept things of value personally and for others, in return for being influenced in the performance of an official act, that is, as set forth more fully Paragraph 11, OUDIT demanded that Contractor B submit Change Order #3, which would enrich BT Contractors and OUDIT, in return for OUDIT's being influenced in whether to support Contractor B's request for an extension of time, contained in Change Order #4.

**(Bribery, in violation of 18 U.S.C. §§ 201(b)(2)(A), 2)**

## COUNT 8
## Bribery

21.     Paragraphs 1-7 and 12 of this Indictment are incorporated by reference as if set out in full.

22.     From in or about May 2002 through in or about October 2002, in the District of Columbia and elsewhere, defendant NARASE BOB OUDIT, a public official, directly and indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept things of value personally and for others, in return for being influenced in the performance of an official act, that is, as set forth more fully Paragraph 12, OUDIT demanded that Contractor C pay BT Contractors as a subcontractor at the Kenilworth Recreation Center project, which would enrich BT Contractors and OUDIT, in return for OUDIT's being influenced in whether to cause OPM to pay Contractor C.

**(Bribery, in violation of 18 U.S.C. §§ 201(b)(2)(A), 2)**

## COUNT 9
## Bribery

23.     Paragraphs 1-7 and 12 of this Indictment are incorporated by reference as if set

out in full.

24.     From in or about early 2002 through in or about February 2003, in the District of

Columbia and elsewhere, defendant NARASE BOB OUDIT, a public official, directly and

indirectly, corruptly demanded, sought, received, accepted, and agreed to receive and accept

things of value personally and for others, in return for being influenced in the performance of

an official act, that is, as set forth more fully Paragraph 12, OUDIT demanded that Contractor

C pay BT Contractors as a subcontractor at the North Michigan Park project, which would enrich

BT Contractors and OUDIT, in return for OUDIT's being influenced in whether to cause OPM

to pay Contractor C.

**(Bribery, in violation of 18 U.S.C. §§ 201(b)(2)(A), 2)**

### COUNT 10
### Forfeiture Allegation

25.     Upon conviction of one or more of the offenses alleged in Counts 1, 3, 4, 5, 6, 8,

or 9 of this Indictment, defendant NARASE BOB OUDIT shall forfeit to the United States

pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) any property constituting or

derived from proceeds obtained directly or indirectly as a result of the said violations, including

but not limited to the following:

a.     A sum of money equal to $13,500 in United States currency, representing the

amount of proceeds obtained as a result of the Honest Services Fraud, Extortion, and

Bribery charged in Counts 1, 5, and 6.

b.     A sum of money equal to $25,000 in United States currency, representing the

amount of proceeds obtained as a result of the Honest Services Mail Fraud and Bribery

charged in Counts 3 and 8.

c.     A sum of money equal to $13,500 in United States currency, representing the

amount of proceeds obtained as a result of the Honest Services Mail Fraud and Bribery

charged in Counts 4 and 9.

**(Forfeiture, in accordance with 18 U.S.C. § 981(a)(1)(c) as incorporated
by 28 U.S.C. § 2461(c), and Rule 32.2(a), Federal Rules of Criminal Procedure)**


TRUE BILL


FOREPERSON



Attorney for the United States in
and for the District of Columbia