## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case Number 06-048 (PLF)** |
| | : | |
| | : | |
| **v.** | : | **FILED** |
| | : | |
| | : | **JUL 2 8** 2006 |
| **NARASE BOB OUDIT** | : | |

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### STATEMENT OF OFFENSES

Pursuant to Fed. R. Crim. P. 11, defendant NARASE BOB OUDIT ("OUDIT") and the

United States agree and stipulate as follows:

1.      OUDIT was employed as a General Engineer in the Capital Construction Services

Division of the District of Columbia's Office of Property Management ("OPM"). OUDIT was a

project manager who oversaw construction projects for the Department of Parks and Recreation.

OUDIT's office was located at 2000 Fourteenth Street, N.W., in the District of Columbia.

2.      OUDIT's job duties included: approving construction plans, recommending

specifications for contracts, inspecting work on projects, approving payments to contractors,

overseeing contractors' performance, and taking appropriate remedial action against poorly

performing contractors, such as issuing a notice of deficient performance or recommending the

termination of a contract. OUDIT also had the authority to recommend the adoption of change

orders, which were modifications to contracts.

3.      BT Contractors, Inc. ("BT Contractors"),  incorporated in Maryland on November

7, 2001, was a general contractor providing construction services. The original directors of BT

were OUDIT and his wife. On a form submitted to the District of Columbia government on or

about April 12, 2002, BT listed OUDIT's wife as its President. At around this time, BT

designated OUDIT's accountant, RD, as its new President.  Even after this formal change,

OUDIT directed BT's activities.  He continued to negotiate contractual arrangements on BT's

behalf and, in conversation, referred to BT as "we" or "I".   OUDIT also continued to have a

financial interest in BT, using money from BT's accounts for his own use and to pay personal

bills, and keeping blank checks from BT's account in his home.

     4.     Contractor A was a building and general contracting company located in

Beltsville, Maryland.  In February 2001, the District of Columbia awarded a $2.5 million contract

to Contractor A to build a recreation center at North Michigan Park.  In March 2002, the District

of Columbia granted another contract to Contractor A, this time for $7.9 million to build a

recreation center at Turkey Thicket.

     5.     Contractor B was a general contracting company located in Gaithersburg,

Maryland.  In October 2001, the District of Columbia granted Contractor B a $4.1 million

contract to build the Sherwood Recreation Center.

     6.     Contractor C was a hardwood flooring company that specialized in gymnasium

flooring and was located in Malvern, Pennsylvania.  In January 2002, Contractor C received a

$70,440 contract to install gymnasium flooring in the North Michigan Park project.  In May

2002, Contractor C received a $93,000 contract to build gymnasium flooring at the Kenilworth

Recreation Center.

     7.     OUDIT was the project manager for the North Michigan Park, Turkey Thicket,

and Sherwood Recreation Center projects.

## Scheme to Demand a Bribe from Contractor A

8.      OUDIT used his position at OPM to demand money from Contractor A in

exchange for permitting Contractor A to receive a necessary time extension for the North

Michigan Park project:

> a.      On or about August 26, 2002, OUDIT demanded a $294,000 payment
>
> from Contractor A.  OUDIT instructed Contractor A to "put [the money] in a
>
> brown bag and send it down the road."
>
> b.      On or about August 27, 2002, Contractor A asked OUDIT what would
>
> happen if Contractor A did not pay OUDIT's bribe.  OUDIT replied, "Here's
>
> what's going to happen.  It's going into default.  If it goes into default, you lose
>
> both [projects].  You don't want to do that.  Then you're going to, bonding
>
> company takes over and they finish the job."  OUDIT  continued, "And then
>
> you're going to be sued.  Now you don't want that."  OUDIT further explained,
>
> "If you do like I said yesterday and it comes through on Friday, what they will do
>
> is try to provide you with additional time to finish it without going the other way."
>
> c.      On or about August 30, 2002, OUDIT received $7,500 in cash, in pre-
>
> recorded Federal Bureau of Investigation ("FBI") funds, from Contractor A.
>
> d.      On or about September 6, 2002, OUDIT received $6,000 in cash, in pre-
>
> recorded FBI funds, from Contractor A.
>
> e.      On or about September 13, 2002, after failing to receive the balance of the
>
> $294,000 that he had demanded, OUDIT telephoned Contractor A's bonding
>
> company and informed the company that OPM was prepared to terminate

Contractor A's North Michigan Park contract, and that bonding company would be required to complete the project.

f.      On or about September 23, 2002, OUDIT once again told Contractor A that unless Contractor A gave OUDIT additional money, Contractor A would not receive a time extension.

## Scheme to Demand a Bribe from Contractor B

9.      Using his position at OPM, OUDIT  demanded that Contractor B submit an inflated change order that would cause BT Contractors to receive $312,519 (subsequently reduced to $271, 000) from a Sherwood Recreation Center subcontract.  OUDIT instructed Contractor B that, using his authority at OPM, OUDIT would procure the approval of the sham change order.  OUDIT also told Contractor B that OUDIT's support of a different change order, in which Contractor B  requested a time extension, was conditioned on Contractor B's submission of the $312,519 change order:

a.      In or about April 2002, acting as BT Contractor's lead negotiator, OUDIT obtained an approximately $1 million subcontract from Contractor B to perform construction work at Sherwood Recreation Center.

b.      In or about May 2002, BT Contractors submitted to Contractor B a request for a change order (later known as "Change Order #4"), in which BT Contractors sought an additional $312,519 supposedly for unexpected excavation, removal, and hauling work on the project.  This cost estimate was inflated.  For Change Order #4 to take effect, Contractor B, the general contractor would have to forward it to OPM, which would have to approve it.

c.    On or about June 26, 2002, Contractor B submitted to OPM Change Order #3, requesting an extension of 90 days on the project, based on delays by OPM in returning drawings and other documents.

d.    On or about August 9, 2002, OUDIT instructed Contractor B that unless Contractor B submitted the inflated Change Order #4, OUDIT would ensure that Change Order #3 would not be approved. OUDIT assured Contractor B that OUDIT would use OUDIT's position to procure OPM's approval of Change Order #4. When Contractor B complained that Change Order #4 was a ruse that would arouse suspicion, OUDIT offered to reduce the change order to approximately $271,000.

e.    On or about August 29, 2002, Contractor B informed OUDIT that it was terminating its subcontract with BT Contractors. In the conversation, OUDIT stated, "I gave you all the time extension. Now don't play hardball with me, alright? Because I'm going to take it away. Then you're all going to eat this." OUDIT later said, "Do you think working for the government pays enough money? ... I gotta do something to make a little on the side, too. I mean, I have my own little construction company." OUDIT also told Contractor B, "I'll give you something out of the deal. I'm not stingy," and assured Contractor B that "nobody has to know."

### Scheme to Demand Bribes from Contractor C

10.    OUDIT used his position at OPM to demand that Contractor C submit inflated bids to prepare flooring at Kenilworth Recreation Center, North Michigan Park, and Sherwood Recreation Center, hire BT Contractors as a subcontractor, and pay BT Contractors for work that it never performed. OUDIT represented that unless Contractor C gave money to BT Contractors,

OUDIT would cause OPM not to pay Contractor C.

a.     In or about May 2002, Contractor C submitted to OUDIT a $64,800 proposal to prepare flooring at the Kenilworth Recreation Center. Shortly thereafter, OUDIT directed Contractor C to increase the bid to $93,000 and to use the additional roughly $25,000 to subcontract to BT Contractors.

b.     In or about July 2002, Contractor C discovered that BT Contractors had not performed any work on project. Nevertheless, OUDIT demanded that Contractor C pay BT Contractors $25,000. OUDIT warned that if Contractor C did not tender this money, OUDIT would ensure that OPM did not pay Contractor C for the work it had performed pursuant to the contract.

c.     Pursuant to this arrangement, Contractor C sent the following checks, each by Federal Express, to BT Contractors, which negotiated the checks:

| Date | Check Number | Amount |
|------|--------------|--------|
| 7/9/02 | 8027 | $12,500 |
| 8/29/02 | 8205 | $7,000 |
| 10/28/02 | 8406 | $5,500 |

d.     In or about early 2002, Contractor C spoke to OUDIT about submitting to OPM a proposal to install flooring at North Michigan Park. OUDIT instructed Contractor C to add to the proposal $15,000, which Contractor C would use to subcontract to BT Contractors. Contractor C complied, and submitted a bid for $70,440, which included $15,000 for BT Contractors.

e.     BT Contractors did not perform any work on the North Michigan Park project.

f.      Pursuant to this agreement, Contractor C sent the following checks, each by Federal Express, to BT Contractors, which negotiated the checks:

| Date | Check Number | Amount |
|------|--------------|--------|
| 11/18/02 | 8468 | $5,000 |
| 12/27/02 | 8552 | $4,000 |
| 1/3/03 | 8565 | $3,000 |
| 1/8/03 | 8567 | $1,500 |

g.      On or about February 25, 2003, Contractor C sent a $1,500 check to BT Contractors, which never negotiated the check. This check was intended to complete payment for the $15,000 that OUDIT had instructed Contractor C to pay to BT Contractors.

h.      In or about August 2002, Contractor C submitted to OUDIT a proposal to construct a gymnasium floor, for $85,630, in the Sherwood Recreation Center. OUDIT told Contractor C, once again, to inflate his bid and use the money to pay BT Contractors. This time, Contractor C declined to inflate the bid.

11.     The amount of money, in bribes, that OUDIT intended to obtain from Contractor A, Contractor B, and Contractor C was between $300,000 and $400,000.

KENNETH L. WAINSTEIN
United States Attorney

By:     *Howard R. Sklamberg*
HOWARD R. SKLAMBERG
Assistant United States Attorney

-7-

## DEFENDANT'S ACCEPTANCE

I have ready every word of this Statement of Offenses. Pursuant to Fed. R. Crim. P. 11, after consulting with my attorney, I agree and stipulate to this Statement of Offense, and declare under penalty of perjury that it is true and correct.

Date: _7/28/06_

NARASE BOB OUDIT
Defendant

I have discussed this Statement of Offenses with my client, Narase Bob Oudit. I concur with his decision to Stipulate to this Statement of Offenses.

THOMAS ABBENANTE, Esq.
Counsel for the Defendant

-8-