**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **Case Number 06-048 (PLF)** |
| | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | |
| | **:** | |
| | **:** | |
| **NARASE BOB OUDIT** | **:** | |

### GOVERNMENT'S SECOND SUPPLEMENT TO
### MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through undersigned counsel, respectfully submits

this Second Supplement to Memorandum in Aid of Sentencing.

On January 3, 2007, the defendant filed a sentencing memorandum in which he requested

a sentence of probation.  The sentencing recommendation is based largely on a letter from Hector

Collison, M.D.

The government arranged for a physical examination of the defendant by Stuart Seides,

M.D., and has attached Dr. Seides's report (dated February 22, 2007), along with Dr. Seides's

curriculum vitae.  The government has also attached a Declaration of Jeffery Allen, M.D., who is

the Chief of Health Programs of the Federal Bureau of Prisons.  Dr. Allen concludes that the

Bureau of Prisons would be able to treat the defendant.

The Court has directed to parties to brief the issue of what effect, if any, the defendant's

health condition should have on his sentence.

### The Defendant's Health[1]

The defendant has a history of type 2 diabetes, hyperlipidemia (high cholesterol),

---

[1]This section is a short summary of the health information contained in the presentence
report and the letters from Dr. Collison and Dr. Seides.

hypertension (high blood pressure), and cardiovascular disease.  As the presentence report

indicates, the first three conditions are being treated with medication.  The government will,

therefore, focus on the defendant's heart condition.

Dr. Collison, the defendant's doctor, points out that Oudit underwent cardiac

catheterization and coronary artery stenting, has chest pains that are responsive to nitroglycerin

administration, and is "in need of repeat evaluation by way of cardiac catheterization and

possible re-stenting may be required."  Dr. Collison concedes that the defendant "did have an

echocardiogram recently which documented preserved and normal ventricular function."  Dr.

Collison advises that the defendant should not be confined because of "the stress of

confinement."  Dr. Collison does not suggest that the Bureau of Prisons would be unable to

monitor Oudit's heart condition, or perform cardiac catheterization or re-stenting.  He focuses

purely on stress.

Dr. Seides reviewed the medical records that the defendant provided to him, including

those written by Dr. Collison.  In February 2007, Dr. Seides performed his own examination of

the defendant, including the administration of an electrocardiogram.  Dr. Seides points out:

•The defendant underwent cardiac catheterization on September 23, 2003.  He received stents.

The result of these procedures was satisfactory.

•The defendant underwent a repeat cardiac catheterization in 2004, and apparently no further

intervention was required.

•The defendant underwent follow-up exercise testing in September 2005, which was interpreted

as "normal."

•Dr. Collison administered an exercise echocardiogram on June 20, 2006, which was reported as

"normal."

•Dr. Seides administered an electrocardiogram in February 2007, which demonstrated "normal sinus rhythm with isolated atrial premature beats, a left atrial abnormality, left axis deviation consistent with left anterior hemiblock, and mild nonspecific T-wave flattening."

Dr. Seides reaches the following conclusion:

> Mr. Oudit has a history of coronary heart disease that was anatomically repaired in September 2003, with no clear-cut subjective or objective evidence of recurrence. At the time of his last visit with Dr. Collison in June 2006, he had an exercise (stress) echocardiogram that was reported as being entirely normal. I find nothing to suggest that his coronary artery disease is currently unstable, and I find no basis upon which to consider that incarceration would pose a significant level of enhanced cardiovascular risk. His basic maintenance medical care should be straightforward and readily available within the correctional medical system.

<u>Bureau of Prisons's ability to treat the defendant</u>

The government asked that Dr. Jeffery Allen, the Chief of Health Programs of the Bureau of Prisons, review Dr. Collison's report and Dr. Seides's report and evaluate whether the Bureau of Prisons could treat the defendant. In his declaration, which is attached, Dr. Allen unequivocally concludes, "Based on the information contained in the letters by Dr. Collison and Dr. Seides, BOP's successful experience treating inmates with health conditions similar to Mr. Oudit's, and my knowledge of BOP's general medical capability, I conclude that BOP would be able to treat Narase Bob Oudit."

Dr. Allen, a board certified physician, has the experience and knowledge to make this conclusion. As his declaration states, prior to his promotion to Chief of Health Programs earlier this year, Dr. Allen served for eight years as the Clinical Director at BOP's FCC Petersburg facility. Dr. Allen's current responsibilities include "consulting with BOP physicians in the field

regarding inmates' clinical care, making recommendations regarding the medical redesignation

of inmates, and making decisions regarding non-formulary medication requests." Dr. Allen

"routinely assess[es] BOP's treatment regimes for inmates." Dr. Allen summarizes his

qualifications: "Based on my position at BOP and my training and experience, I am very familiar

with the medical care that BOP provides to inmates and am able to assess whether BOP has the

capacity to treat various medical conditions."

     Dr. Allen then explains his conclusion:

> BOP successfully treats many inmates with conditions similar to Mr. Oudit's. Indeed, BOP successfully provides (either directly or by contracting with an outside doctor) medical care to inmates with coronary conditions that are more serious and/or more unstable than Mr. Oudit's.

> For example, BOP performs or contracts with cardiologists to perform the following procedures, among others: heart bypass surgery, the insertion of stents and pacemakers, the implantation of cardiodefibrilators, cardioverting hearts with bad rhythms, electrophysiology studies with ablation, cardiac catheterization, and medication management of heart diseases. BOP also manages the care of inmates who have had heart transplants.

> BOP examines inmates with chronic but stable heart conditions every six months. Based on an inmates' medical condition, BOP assigns a care level, and adjusts the inmate's treatment accordingly. If there is an indication that an inmate's condition is no longer stable, BOP performs more frequent examinations. If there is a health emergency, BOP provides immediate medical attention.

     Dr. Allen also states that BOP treats stress, the issue on which Dr. Collison focused:

"BOP treats inmate stress. BOP maintains a psychology staff that meets with inmates to treat

stress and also provides medication to manage conditions such as anxiety disorders."

     As Dr. Allen's declaration makes very clear, the defendant's medical condition is far

from unique. BOP successfully treats many inmates like the defendant, and there is no reason to

believe that the defendant's case would be any different.

<u>Legal precedent</u>

Many courts have incarcerated defendants whose health conditions are similar to or more serious than the defendant's.

Prior to the Supreme Court's decision in *Booker*, reductions in a guidelines sentence based on medical condition were governed by U.S.S.G. § 5H1.4, which provides:

> Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure may be warranted. However, an extraordinary physical impairment may be a reason to depart downward; <u>e.g.</u>, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

The Court of Appeals has noted that § 5H1.4 "requires not just 'infirm[ity]' but 'extraordinary physical impairment.'" *United States v. Brooke*, 308 F.3d 17 (D.C. Cir. 2002). In *Brooke*, the Court of Appeals affirmed the trial court's decision not to grant a medical departure to an 82-year-old drug defendant who suffered from a markedly swollen right knee with joint effusions, pain, stiffness in the hands, prior evaluations of chest pains, respiratory problems, and arthritis. The trial court had observed that perhaps it could "depart where there is serious physical impairment that can be exacerbated by incarceration and cannot be adequately treated by the Federal Bureau of Prisons." *Id.* at 22 (quotations omitted). In affirming, the Court of Appeals held that the trial court "did not misunderstand the sentencing guidelines or its authority to depart from the applicable guidelines range." *Id.* at 23. The ability of the Bureau of Prisons to treat a defendant is thus a critical part of the § 5H1.4 analysis.

After *Booker*, courts may consider medical condition as a sentencing factor. Indeed, a sentencing court must consider the "the need for the sentence imposed ... to provide the

defendant with needed ... medical care." 18 U.S.C. § 3553(a)(2)(D). *See United States v. Whipple*, 414 F.3d 887, 888 (8th Cir. 2005) (sentencing court must consider the defendant's health when imposing a post-*Booker* sentence).

Under both the pre- and post-*Booker* regimes, courts have declined to reduce guidelines sentences of incarceration based on medical conditions similar to or more severe than the defendant's.

In *United States v. Jauregui-Perez*, 376 F. Supp. 2d 1060 (D.N.M. 2004), a pre-*Booker* case, the defendant suffered from congestive heart failure, which "is a disorder in which the heart loses its ability to pump blood efficiently." *Id.* at 1061. This condition has four stages, the fourth being the most serious. The defendant was in stage one, two, or three. *Id.* at 1062. The court reasoned that "[w]hile it may be true that congestive heart failure is a serious medical condition, physicians are able to control the defendant's condition with medical supervision and medication." *Id.* at 1062. The court cited the ability of the Bureau of Prisons to provide the appropriate care for this ailment.

In the pre-*Booker* case of *United States v. Mallon*, 345 F.3d 943 (7th Cir. 2003), the district court granted a downward departure to a defendant who had suffered a heart attack, obtained quadruple bypass surgery, and received a stent. The departure was based on reduced mental capacity, health, and nationality. The Seventh Circuit reversed, noting that there was no evidence that the defendant's medical treatment would be markedly inferior in prison or that his life span would be shortened. *See id.* at 948.

In *United States v. Anderson*, 2006 WL 1476910 (4th Cir. May 26, 2006), the defendant filed a motion for downward departure from his 135-168 month guidelines sentence, alleging that

he had congestive heart failure and renal disease. The sentencing court described the defendant's

ailments as "serious" and "significant," "but not extraordinary." *Id.* at *1. The court decided to

impose a sentence at the low end of the guidelines range (not its normal practice), but refused to

grant either a downward departure under § 5H1.4 or a *Booker* variance under 18 U.S.C. §

3553(a). The Court of Appeals affirmed. *See id.* at *2.[2]

### Conclusion

The government's initial sentencing memorandum recommended a sentence of 37 months

of incarceration, the low end of the guidelines range. The Court should not reduce this sentence

because of the defendant's medical condition.

To be sure, the defendant has had trouble with his heart, and underwent coronary artery

stenting in 2003. However, he has received at least four medical examinations since then,

including cardiac catheterization (2004), exercise testing (2005), an exercise echocardiogram

(2006), and an electrocardiogram (2007). As Dr. Seides explains, there is:

- "no clear-cut subjective or objective evidence of recurrence;"

- "nothing to suggest that [the defendant's] coronary artery disease is currently unstable;"

- and "no basis upon which to consider that incarceration would pose a significant level of enhanced cardiovascular risk."

Dr. Collison concedes that the 2006 echocardiogram, which he administered, "documented

preserved and normal ventricular function."

Not only would the Bureau of Prisons be able to treat the defendant, but, as Dr. Allen's

---

[2]The government's sentencing recommendation for Oudit – a sentence at the low end of the guidelines range, but downward variance or departure – is the same as the *Anderson* court's sentence.

declaration shows, it has successfully treated inmates with heart conditions more serious than the defendant's. Indeed, Dr. Seides indicates that the defendant's "basic maintenance medical care should be straightforward and readily available within the correctional medical system." The Bureau of Prisons performs cardiac catheterization and re-stenting, the two possible future treatments that Dr. Collison mentions. As for stress, to which Dr. Collison alludes, the Bureau of Prisons maintains a staff of psychologists and administers medication, when necessary.

Finally, because the defendant is a white-collar offender with no history of flight or dangerousness, the Bureau of Prisons would have great flexibility in placing him in a facility consistent with his medical needs.

The defendant's corruption offenses are egregious. He used his position of trust to attempt to extort hundreds of thousands of dollars from contractors. He took bribes, and made threats to cripple economically a contractor that would not succumb to the defendant's demands. He deserves every day of a 37-month sentence of incarceration. His medical conditions should not disturb what would be a just sentence.[3]

---

[3]One issue that may arise at sentencing is whether the court may impose restitution to the FBI because Oudit received FBI pre-recorded funds. Courts of Appeals have held that a sentencing court may not order restitution based on the costs of investigations, including the use of pre-recorded funds. *See United States v. Cottman*, 142 F.3d 160, 168-170 (3d Cir. 1998); *United States v. Meacham*, 27 F.3d 214, 218-19 (6th Cir. 1994); *United States v. Gall*, 21 F.3d 107, 109-11 (6th Cir. 1994).

Respectfully submitted,

JEFFREY A. TAYLOR
D.C. Bar Number 498610
United States Attorney


_____/s/_____
HOWARD R. SKLAMBERG
D.C. Bar Number 453852
Assistant United States Attorney
Fraud & Public Corruption Section
555 Fourth Street, N.W.
Washington, DC 20001


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing motion was served by electronic mail upon Thomas Abbenante, Esq., tabbenante@yahoo.com, this 20th day of April, 2007.

_____/s/_____
Howard R. Sklamberg